MARGARITA ROMERO VDA. DE ORTIZ, demandante y recurrente, *v.* COUTURE NATIONAL CAR RENTAL SYSTEM y FERNANDO LEÓN FLORES, demandados y recurridos.

Número: 12926     Resuelto: 11 de abril de 1963

*Rodolfo Aponte, Antonio José Amadeo* y *Antonio José Amadeo, Jr.,* abogados de la recurrente; los recurridos no comparecieron.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

PER CURIAM: La Sala de San Juan del Tribunal Superior declaró sin lugar una demanda de daños, y se apeló el fallo. La Sala sentenciadora hizo las siguientes conclusiones de hecho:

"El 17 de noviembre de 1956, a eso de las 6:30 A.M., Angel Luis Ortiz Martínez, esposo de la demandante Margarita Romero, conducía un Scooter en la Avenida Ashford, Condado, Santurce, Puerto Rico. Delante de dicho Scooter venía una limosina de las que se utilizan para conducir pasajeros de la propiedad de la demandada, Couture National Car Rental System, guiada en esos momentos por el co-demandado Fernando León Flores.

"Dicha limosina venía a velocidad moderada, alrededor de 15 millas por hora, y al acercarse a la entrada del Hotel Condado se fue separando gradualmente hacia la izquierda de la Avenida

para poder entrar a dicho hotel. Cuando ya aproximadamente la mitad de la limosina había entrado al "driveway" o entrada del hotel, el "Scooter" guiado por el esposo de la demandante chocó contra la parte trasera de la limosina con tal violencia que fue lanzado por encima del vehículo de la demandada, cayendo en el centro de la carretera y muriendo como consecuencia de las lesiones que sufrió en el accidente.

"El único testigo presentado por la demandante sobre la forma en que ocurrió el accidente fue Ramón Laureano Rosa. El testimonio de Laureano Rosa no logró establecer una "scintilla" de evidencia sobre la cual el Tribunal hubiese podido fundar una conclusión de negligencia de parte del chofer de la demandada.

"Laureano Rosa testificó que al ir a entrar la limosina redujo su marcha; que la misma venía a velocidad moderada; que el Scooter venía como a una distancia de dos carros detrás de la limosina; que la mitad de la limosina había entrado al "driveway" del Hotel Condado cuando ocurrió el choque; que no pudo observar si las luces direccionales de la limosina estaban o no emitiendo señales."

Como cuestión de derecho concluyó la Sala que no se había demostrado negligencia por parte de los demandados. La demandante sometió su caso con la declaración de un solo testigo sobre los hechos. Sustancialmente, éste declaró así:

"R.—Bueno, el accidente ocurrió estando yo sentado mirando a ambas direcciones pues yo ví, pude apreciar que venía una limosina o carro Cadillac . . .

HON. JUEZ:—
Cómo?

R.—Un carro Cadillac, la llamamos limosina, que carga bastantes pasajeros y entonces venía, pude observar desde el "swimming pool" que queda antes del Condado venía la limosina.

P.—Venía como por el "Swimming pool"?

R.—Una cosa así, por el "swimming pool" y entonces ya venía tirándose hacia el medio para cortar hacia El Condado porque ahí era una entrada, que sea carro o limosina tiene que tirarse allá para entrar y entonces el *"driver"* venía en esa dirección tirándose y al entrar

así pues venía detrás del carro prieto, de la limosina, venía un joven en un "scooter".

. . . . . . . .

P.—De dónde venía, a su izquierda o a su derecha?

R.—Venía por su derecha.

P.—Por el lado derecho suyo o venía por el lado izquierdo?

R.—Iba tirándose al lado izquierdo.

P.—Venía del Aeropuerto Internacional?

R.—Venía del aeropuerto.

. . . . . . . .

P.—Había tráfico a esa hora?

R.—A esa hora no había tráfico, porque a esa hora no había tráfico ninguno. Yo pude observar mas que la limosina y el "scooter", bien temprano.

R.—A qué velocidad, si pudo apreciarla, venía la limosina?

R.—Venía como 15 o 20, a una distancia así porque el millaje no, entiende. Una cosa así.

P.—Usted podría decir al Tribunal si venía a una velocidad rápida o moderada o lenta?

R.—Moderada.

P.—Y dice usted que detrás venía un "scooter"?

R.—Un "scooter" "brown" o gris.

P.—A qué velocidad venía ese "scooter"?

R.—El "scooter" venía casi a la misma velocidad, como a dos carros detrás del Cadillac o del carro.

P.—Como a dos carros?

R.—Como a dos carros.

. . . . . . . .

P.—La velocidad del "scooter" era igual o mayor?

R.—Era igual.

P.—Mencionó usted hace un momento cuando declaraba que esta limosina se tiró hacia qué lado?

R.—El se tiró hacia el medio, como estaba cogiendo el lado izquierdo del chofer.

P.—Quiere decir que la limosina se tiró al lado izquierdo de la carretera por el centro o cómo?

R.—Se tiró hacia el centro cogiendo bastante parte del lado de allá, como era muy grande hay que tirarse para poder coger la entrada.

P.—Esa limosina entonces giró, para entrar al hotel?

R.—Sí, giró para entrar al hotel.

P.—Mientras esa limosina se movía en esa maniobra que usted nos describe, el "scooter" venía detrás?

R.—Detrás.

P.—Desde donde usted estaba, pudo usted observar si las señales de la luz de la limosina funcionaban?

R.—No pudo observarlo.

P.—Al decir usted que no pudo observarlo quiere decir que no funcionaban o que usted no vió si funcionaban?

R.—Bueno al doblar así que se tirá así no ví si funcionaba, pero al entrar hacia adentro no la ví.

HON. JUEZ:—

No qué?

R.—No ví las luces porque no podía apreciar las luces de atrás. Al entrar adentro se podían apreciar y no la ví.

LCDO. APONTE:—

P.—No las vió prendiéndose y apagándose, o las vió?

R.—No las ví ni prendiéndose ni apagándose.

P.—Si hubieran estado prendiéndose y apagando las hubiera podido ver?

R.—Sí, se podía a pesar de donde estaba.

P.—Yo no estoy hablando cuando entró en la marquesina, estoy hablando el paso anterior según usted describe la limosina que viene y se vira un poco al medio o izquierda?

R.—Yo no la ví.

P.—En ese momento si estaban funcionando o no?

R.—Ahí no pude verla.

P.—Usted quiere decir que han podido estar funcionando y usted no verla?

R.—Podían haber estado y no podían haber estado.

P.—Si estaban o no estaban, usted no lo sabe?

R.—No lo sé.

P.—Es posible que hubieran estado?

R.—Es posible.

P.—Simplemente usted no vió eso?

R.—No lo ví.

P.—Esta maniobra que describe de la limosina de abrirse para entrar fue una maniobra corrida o pudo apreciar si la limosina frenó o detuvo o redujo su marcha?

.     .     .     .     .     .     .     .

P.—Si usted vió que la limosina entró por allí a la misma velocidad que venía o si usted vió que la limosina redujo su marcha para hacer esa maniobra?

R.—Sí la redujo, redujo un poco.

P.—Cómo fue que redujo la velocidad?

R.—En esos momentos redujo un poco la velocidad entiende. En esos momentos no hay mucho tráfico y se tiró, ve y redujo un poco la velocidad.

P.—Cuando la limosina dobla a la derecha para entrar a la entrada de El Condado, antes de entrar ahí se detuvo en su marcha?

R.—Detuvo un poco.

P.—Podría usted decirnos si toda la maniobra de doblar, abrirse y entrar fue un movimiento continuo o si fue detenido?

R.—Fué un movimiento un poco continuo.

P.—Testigo, cómo fue que ocurrió el impacto entre la motora y la limosina?

R.—Al entrar la limosina que viene desde allá, que viene abriéndose un poco hacia la parte izquierda venía la motorita detrás.

P.—Por su sitio venía la motora, por el medio, izquierda o dónde?

R.—Venía detrás, por el mismo sitio de la limosina. Entonces al irse cogiendo la limosina su entrada, ella venía detrás y trató de tirarse hacia afuera a la izquierda.

P.—Hacia la izquierda de la limosina?

R.—Hacia la izquierda de la parte trasera de la limosina y ahí chocó con la parte trasera, o sea guardalodo izquierdo, contra el guardalodo izquierdo pero cosita retirado como dos cuartas del guardalodo y ahí fue donde dio vueltas el manublio y cayó patas arriba encima del muro ese de hierro que hay allí, mirando los pies para Isla Verde y el cráneo para San Juan.

P.—Usted nos había dicho que la limosina venía por su derecha y entonces se abrió?

R.—Sí señor, se abrió.

P.—La Vespa venía, el "scooter" venía por su derecha?

R.—Por su derecha.

P.—Cuando la limosina se abrió a la izquierda la Vespa se abrió con ella, siguió derecho ó qué hizo?

R.—El "scooter". . . .

. . . . . . . .

LCDO. APONTE:—

P.—Es decir, entonces cuando la Vespa giró a la izquierda viró de la derecha hacia el centro?

R.—Sí señor.

P.—Cuando la Vespa gira hacia la izquierda, qué es lo que tiene delante?

R.—Frente con la limosina, la limosina toda cruzada para entrar.

HON. JUEZ:—

Entrando?

R.—Entrando.

LCDO. APONTE:—

P.—Entonces si entiendo bien, la limosina gira y entra?

R.—Y entra.

P.—Es entonces o es después o es antes que la Vespa gira para la izquierda, o sea dónde estaba la limosina cuando el del "scooter" giró a la izquierda?

R.—Estaba entrando.

. . . . . . . .

P.—Cuándo ocurrió el impacto que usted dijo que el muchacho saltó por encima y cayó?

R.—Sí, por la orillita de la partecita de la luz trasera.

P.—Tropezó con la parte de atrás?

R.—Sí. Entonces parece que al darle al manublio y el guardalodo de atrás por la luz pues cambió y cayó 'patas arriba'. Casualmente así.

. . . . . . . .

P.—Usted pudo observar si en el momento de ese accidente tenía los cristales altos o bajos?

R.—Estaba toda cerrada.

P.—Por qué lo sabe usted?

R.—Esas limosinas usan aire acondicionado.

P.—Usted lo vió?

R.—Eso lo ví yo.

P.—Entonces cuando ocurrió el choque la limosina no se detuvo, siguió?

R.—Siguió. Se paró dentro de la marquesina.

P.—Cuánto tiempo estuvo usted allí con el lesionado?

R.—Bueno yo estuve allí como 15 minutos o 12 minutos porque después que entró al "driveway" dejó unos americanos allí y después fué que recogió . . . según me dijeron lo recogió el enfermo."

En el contrainterrogatorio el testigo manifestó:

"P.—Y la realidad es que usted presume que tenía las ventanillas cerradas, muy lógicamente porque es aire acondicionado?

R.—Siempre yo declaré que los cristales estaban cerrados porque los ví cerrados.

P.—Porque se trataba de aire acondicionado?

R.—Yo los ví primero.

P.—Usted recuerda haberlos visto cerrados?

R.—Sí.

.    .    .    .    .    .    .    .

P.—Entonces en otras palabras, como usted explicó al señor juez a preguntas del compañero Aponte, la limosina venía a una velocidad bastante moderada?

R.—Quince millas, una velocidad así. Dentro de un carro es que se puede apreciar cuando uno va corriendo.

P.—Gradualmente venía abriéndose para entrar en El Condado?

R.—Sí.

P.—Y ya había entrado más o menos como la mitad de la limosina cuando ocurrió el accidente, es correcto eso?

R.—Como yo expliqué y como yo quiero explicarle, estaba al frente del accidente. Cuando la limosina venía tirándose a la izquierda ahí fué el impacto.

P.—Usted no declaró, si recuerda, cuando una pregunta de la deposición, usted no dijo la mitad de la limosina?

R.—Me acuerdo habérselo dicho."

Con la anterior prueba la Sala sentenciadora declaró con lugar una moción de *"nonsuit"* y desestimó la demanda. A solicitud de la propia parte demandante dejó luego sin efecto la sentencia y continuó el juicio. La demandante no adujo

prueba adicional y se recibió el testimonio del conductor del vehículo. En muchos extremos este testimonio coincide con el anterior, si bien el conductor declaró que hizo las correspondientes señales con la luz y con la mano y que los cristales de la puerta en ese momento estaban bajos.

*Aun cuando se descarte el testimonio más favorable del conductor, a la luz del testimonio del único testigo de la parte demandante la sentencia de la Sala sentenciadora debe ser confirmada.* La recurrente nos invoca la decisión en *Brazee* v. *Wise*, 83 D.P.R. 179 (1961). La manera de ocurrir el accidente en el caso de *Wise*—vehículos moviéndose a razón de 40 millas por hora en la zona rural, y el sitio por donde hubo el impacto entre los mismos—presenta una situación claramente distinguible de la del caso de autos en cuanto a la norma allí seguida.